**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER NAUMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:20-cv-1048-MTS |
| | ) | |
| KILOLO KIJAKAZI, *Acting Commissioner of* | ) | |
| *the Social Security Administration*,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of the final decision of Defendant, the Acting

Commissioner of Social Security, denying the application of Christopher Naumann ("Plaintiff")

for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381–85 (the "Act").  For the following reasons, the matter is reversed and remanded for further

proceedings.

## I.    Procedural History

On September 8, 2017, Plaintiff filed an application for SSI benefits.  (Tr. 173–178).  After

Plaintiff's application was denied, he requested a hearing from an Administrative Law Judge

("ALJ").  (Tr. 141).  On July 1, 2019, Plaintiff and his counsel appeared for an in-person hearing

before the ALJ.  (Tr. 61–93).  In a decision dated September 24, 2019, the ALJ concluded Plaintiff

was not disabled under the Act.  (Tr. 14–28).  The Appeals Council denied Plaintiff's request for

review on June 10, 2020.  (Tr. 1–6).  In denying Plaintiff's request for review, the ALJ's decision

stands as the Commissioner's final decision.[2]

---

[1] Kilolo Kijakazi is now the Acting Commissioner of SSA.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kijakazi is substituted as the proper defendant.
[2] Section 1383(c)(3) of the Act provides for judicial review of the SSA Commissioner's "final decision."

II.      **Evidence Before The ALJ**

   A.   **Overview of Relevant Facts and Medical History**

   Plaintiff was born on March 21, 1973, and alleged onset of disability on May 26, 2017 at

44 years old.  (Tr. 173).  Plaintiff claimed disability from bipolar disorder, schizophrenia, attention

deficit hyperactivity disorder ("ADHD"), anxiety disorder, and alcohol dependence.  (Tr. 205).

Plaintiff reported completing tenth grade in 1988 but later earning his GED in 2003.  During high

school in 1989 and 1990, Plaintiff was hospitalized because of a series of runaways, poor

judgment, impulsive behaviors, and challenging authority.  It was noted he refused counseling and

to take medications.  Soon after, Plaintiff began consuming alcohol.  Later, Plaintiff had several

DWI's and consequently served time in prison.  After being in and out of prison, Plaintiff had a

history of homelessness, but currently lives with his mother and father.

   Extensive records spanning four decades chronicle Plaintiff's longstanding mental health

impairments and substance abuse.  Plaintiff's recurrent diagnoses throughout his life are for mental

conditions including schizophrenia/schizoaffective disorder, bipolar disorder, alcohol use

disorder, and cannabis use disorder.

   Plaintiff first sought help for his symptoms when he was 21 years old and has a long history

of mental hospitalizations.  (Tr. 542, 1985).  This history includes at least two hospitalizations for

suicide attempts and several others due to extreme symptoms such as hallucinations and

depression.   Years of medical records also detail hospitalizations for excessive alcohol

consumption and, beginning in 2018, hospitalizations primarily from marijuana use.[3]  Medical

records also show that Plaintiff self-medicates.  For decades, medical records show Plaintiff

---

[3] From April 2018 to September 2018, Plaintiff returned to the emergency department on at least five different occasions for abdominal pain, nausea, and vomiting.  Doctors attributed the symptoms to cannabis hyperemesis, a condition developed from long term use of marijuana. (Tr. 901, 1421).

2

experienced auditory hallucinations and more recently, visual hallucinations.  These same records show Plaintiff reports using substances to make the voices go away.  (Tr. 400, 379, 590, 107).  Plaintiff also reports using substances to help with anxiety, mood, sleep, and to "feel better."  (Tr. 1545, 2011, 1988, 531, 545, 587, 590, 594, 603, 1862).

In September 2016, Plaintiff overdosed on medication and alcohol because the voices were loud and he wanted to drink them away.  (Tr. 400–36).  After this incident, Plaintiff cut back on his alcohol intake, primarily turning to marijuana to alleviate his symptoms, but relapses into excessive drinking when his mental symptoms worsened or he is under stress.[4]  (Tr. 1544–45, 1987–89, 2012).  Plaintiff's care providers at Places for People[5] ("Providers") note Plaintiff struggles with appropriate coping strategies and how to handle stress; Plaintiff often turns to marijuana and alcohol to cope and for stress.  (Tr. 1544–45, 1986, 2059, 1988, 2011–12, 2072).  Records show Providers specifically work with Plaintiff to build healthy coping mechanisms, (Tr. 2060, 2066, 2069, 2072, 2075), and Providers specifically noted Plaintiff's "poor insight and judgment" in relation to his alcohol and marijuana use.  (Tr. 1786).

Plaintiff explained that his worse symptom is the "voices"—"always voices.  Never stops." (Tr. 542).  Plaintiff described the voices as follows: "it's like having an entertainment system in your head, but you can't see the movie."  (*Id.*).  Plaintiff frequently described the voices as telling him to hurt himself and break things; sometimes the voices would argue together.  (Tr. 603–04).  At the ALJ hearing, Plaintiff explained he struggles to keep a full time job for more than a few months, especially due to walking off jobs because he leaves work when he hears "voices" that say "[l]ets just leave, forget this, you don't need this."  (Tr. 77–79).  Plaintiff also reported getting

---

[4] In April 2019, Providers noted Plaintiff is "mostly honest with staff regarding substance use."  (Tr. 1988).
[5] At Places for People, Plaintiff is treated by an "ACTION Team" which consists of several specialists including, Dr. Meredith Throop, Robert Stigers (R.N.), Joshua Doyle (MA/MS), and Joshua Brumfield (BA/BS).

"overwhelmed" because the voices "interfere with his concentration." (*Id.*). The record shows medication helps make the voices "quieter" but never disappear. (Tr. 396, 1858, 603–04, 594, 590, 1446, 576, 570–72, 2060–02, 2065). Also, records show these auditory and visual hallucinations worsen with stress. (Tr. 527, 581, 1544–45, 1535, 1529–31).

Plaintiff's mental health symptoms manifest in other ways too. Plaintiff often injures himself to cope with his emotions. As an example, in May 2018, Plaintiff reported cutting himself again to "just kill[] the pain with more pain." (Tr. 1777). Records also show Plaintiff becomes suicidal and more aggressive upon drinking.[6] (Tr. 1446). Years of records also show frequent symptoms of poor sleep, anxiety, feelings of hopelessness, irritability, trouble concentrating, decreased appetite, and poor insight and judgment. A longitudinal look at Plaintiff's history shows medication has lessened the severity or improved such symptoms. But these same records show a history of Plaintiff reporting his medications are not working or presenting with continuous symptoms and subsequent adjustments to the medications are made. (Tr. 1544–45, 1869, 1859, 586, 604, 595, 389–99, 431, 577).

In April 2019, Plaintiff's Providers noted that his schizoaffective disorder symptoms "have been stable in recent years to due to medication compliance." (Tr. 2011). Providers further noted that despite being "stable," Plaintiff "present[ed] with significant conditions and illnesses at varying degrees of control." (*Id.*). Further, the Providers noted that despite Plaintiff's medication compliance, Plaintiff continues to struggle with emotional regulation and social anxiety, which led to his most recent termination from employment, as well as poor sleep, depression, and poor insight and judgment. (*Id.*).

---

[6] As an example, in 2015, Plaintiff was admitted to the hospital following an attempted overdose after relapsing on alcohol after one to two years of sobriety.

### B. Medical Opinion and other Opinion Evidence

#### 1. *Dr. Skolnick's Medical Opinion*

In February 2018, Dr. Skolnick—a non-examining consultative psychologist—completed a Psychiatric Review Technique Form and Mental RFC Assessment of Plaintiff. (Tr. 125–30). Dr. Skolnick found that Plaintiff had severe mental impairments that caused moderate limitations in understanding, remembering, and applying information; concentrating, persisting, and managing pace; and adapting and managing oneself. She also determined that Plaintiff retained the ability to understand and remember simple instructions; sustain concentration, persistence, or pace in simple tasks; and adapt to changes that were introduced gradually. Dr. Skolnick opined Plaintiff retained the ability to interact socially in a setting that did not involve close or frequent contact with others.

#### 2. *Brumfield and Huhn's Opinion*

In May 2019, two Providers from Places to People—Joshua Brumfield, an Integrated Health Coach, and Julie Huhn, an Employment Specialist—provided a "mental medical source statement." (Tr. 1437–40). The statement noted diagnoses of schizoaffective disorder depressive type, alcohol use disorder, and cannabis use disorder, with signs and symptoms that included anxiety, poor emotional regulation, and poor problem-solving skills. Brumfield and Hahn also opined that Plaintiff had marked limitations in his abilities to maintain the necessary concentration to persist at simple routine tasks eight hours, five days a week; initiate and complete tasks in a timely manner; ignore or avoid distractions; use reason and judgment to make work-related decisions; regulate emotions, control behavior, and maintain well-being in a work setting; keep social interactions free of excessive irritability, argumentativeness, sensitivity or suspiciousness; and respond appropriately to requests, criticisms, suggestions, correction, or challenges. They

indicated that Plaintiff was moderately limited in his abilities to sustain ordinary routine and regular attendance; function independently; work a full day without needing more than the allotted number or lengths of rest periods; distinguish between acceptable or unacceptable work performance; and maintain socially acceptable behavior. They further indicated that Plaintiff's overall pace of production was expected to be 21- to 30-percent below average for simple tasks in a low stress environment; that he could perform in a task-oriented setting where contact with the public and coworkers was only casual and infrequent, and where supervisors provided simple instructions for non-detailed tasks with no more than four supervisor contacts per day; and that he would likely need to leave work early or be late to work twice a month and miss one day of work per month due to psychologically based symptoms.

## III.   **Standard of Review and Legal Framework**

To be eligible for SSI benefits, Plaintiff must prove that he is disabled under the Act. *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Administration ("SSA") has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 416.920(a). Steps 1–2 require the claimant to prove (1) he is not currently engaged in substantial gainful activity and (2) he suffers from a severe impairment. *Id.* at §§ 416.920(a)(4)(i)–(ii). At Step 3, only after a severe *mental* impairment is found, the ALJ will compare the medical findings about the claimant's severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. *Id.* at § 416.920a(d). If the ALJ concludes the severe mental impairment neither meets nor is equivalent in severity to any listing, the ALJ will then assess the claimant's residual functioning capacity ("RFC"), *Id.* at § 416.920a(d)(3), "which is the most a claimant can do despite h[is] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); 20 C.F.R. § 416.945. The Eighth Circuit has

noted that the ALJ must determine a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).  At Step 4, the ALJ must determine whether the claimant can return to his past relevant work.  20 C.F.R. § 416.920(f).  If the ALJ finds at Step 4 that a claimant cannot return to past relevant work, the burden shifts at Step 5 to the ALJ to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.* at §§ 416.920(g), 912(b)(3), 960(c).

The court's role on judicial review is to decide whether the ALJ's determination is supported by "substantial evidence" on the record as a whole.  *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Even if substantial evidence would have supported an opposite decision or the reviewing court might have reached a different conclusion had it been the finder of fact, the Court must affirm the Commissioner's decision if the record contains substantial evidence to support it.  *See McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the ALJ's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome"); *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992) (explaining a court may not reverse merely because substantial evidence would have supported an opposite decision).  The Eighth Circuit has emphasized repeatedly that a court's review of an ALJ's disability determination is intended to be narrow and

7

that courts should "defer heavily to the findings and conclusions of the [ALJ]." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision," *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998), and not merely a "rubber stamp." *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990)

## IV.   The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  At Step 1, the ALJ found Plaintiff did not perform substantial gainful activity ("SGA") during the alleged period of disability.  (Tr. 16–17).  At Step 2, the ALJ found Plaintiff had *severe* impairments of schizophrenia/schizoaffective disorder, bipolar disorder without mention of psychotic features, alcohol abuse, benzodiazepine dependence, and marijuana use disorder.  (Tr. 17–18).  At Step 3, the ALJ found Plaintiff did *not* have an impairment or combination of impairments that met or medically equaled the severity of a statutorily recognized impairment.  (Tr. 18–19).  Thus, the ALJ found Plaintiff had the RFC to perform "medium work," as defined in 20 C.F.R. § 416.967(c), with postural, environmental, and mental limitations.  (Tr. 19).  Plaintiff cannot climb ladders, ropes, or scaffolding and should avoid all exposure to unprotected heights and exposure to hazardous machinery.  Plaintiff is limited to routine, repetitive tasks in a low stress job, defined as requiring "only occasional decision making and only occasional changes in the work setting."  At Step 4, the ALJ found Plaintiff had no past relevant work to which he could return.  (Tr. 26).  At Step 5, the ALJ considered Plaintiff's age, education, work experience and RFC, and found there were jobs in the national economy that Plaintiff could have performed during

the relevant period, including medium, unskilled work as a hand packager, laundry/drycleaner, and kitchen porter. (Tr. 27). As such, the ALJ found that Plaintiff is not disabled under the Act.

## V.   __Discussion__

The record is clear that Plaintiff has several mental disorders that are longstanding; he has suffered with mental health symptoms since childhood, frequently experiences hallucinations, and has a history of psychiatric hospitalizations as well as other hospitalizations possibly stemming from his mental impairments. The ALJ erred in attributing Plaintiff's limitations from schizophrenia and bipolar disorder to non-compliance and other issues unrelated to his ability to work. Such errors also tainted the ALJ's assessment of Plaintiff's functional limitations from his severe mental impairments at Step 3, the RFC finding, and the Step 5 assessment of Plaintiff's ability to obtain jobs within the national economy. Thus, for these reasons and several others discussed below, the Court remands the case because the ALJ's decision is not supported by substantial evidence, including necessary medical evidence.

1. ***The ALJ Improperly Evaluated Plaintiff's Mental Impairments***

The Court finds the ALJ erred in attributing Plaintiff's symptoms from schizophrenia and bipolar disorder to "non-compliance." Notably here, non-compliance appears to mainly refer to Plaintiff's non-compliance with treatment recommendations to abstain from substances, rather than non-compliance with taking his medications as prescribed. Several times throughout the decision, the ALJ determined that when Plaintiff is compliant with treatment and medication he suffers from "few limitations" and his impairments are controlled. *See Hensley v. Colvin*, 829 F.3d 926, 933–34 (8th Cir. 2016) (explaining if "an impairment can be controlled by treatment or medication, it cannot be considered disabling"). However, for reasons discussed below, the ALJ's determination is not supported by substantial evidence.

9

First, substantial evidence does not support the ALJ's determination that Plaintiff's condition is controlled when he is compliant with medication and treatment. *See Frederick v. Berryhill*, 247 F. Supp. 3d 1014, 1028 (E.D. Mo. 2017) (remanding in part for same reason). To the contrary, the record shows that even when Plaintiff abstained from alcohol and was compliant with medication, his hallucinations and other symptoms *remained*, and sometimes exacerbated. As recently as April 2019, Providers noted that even when compliant with medication, Plaintiff "present[ed] with significant conditions and illnesses at varying degrees of control,"—despite being "stable." This treatment note is supported by a longitudinal look at Plaintiff's medical records and treatment showing Plaintiff's mental impairments are difficult to manage and susceptible in the type or severity of symptoms. *Mabry v. Colvin*, 815 F.3d 386, 392 (8th Cir. 2016) (affirming ALJ decision because when schizophrenic claimant consistently and properly used medication the record shows his mental illness is not "particularly difficult to manage or susceptible to wide swings in the type or severity of symptoms"). Indeed, the record shows frequent and ongoing changes to Plaintiff's prescription regimen. *See Porter v. Colvin*, No. 4:14-cv-00813-NKL, 2015 WL 3843268, at *6 (W.D. Mo. June 22, 2015) (finding claimant's need for ongoing changes to prescription regimen suggests that, even with treatment, symptoms were not under control). Finally, to the extent the ALJ found that *periods* of improvement suggest that Plaintiff's mental impairments were controlled or controllable by medication, the Court notes that "recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation." *Lillard v. Berryhill*, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019) (citing, among other cases, *Jones v. Chater*, 65 F.3d 102, 103 (8th Cir. 1995)). In fact, even "symptom-free intervals do not necessarily compel . . . a finding [of not disabled] when a mental disorder is the basis of a [disability] claim." *Wigfall v. Berryhill*, 244 F. Supp. 3d 952, 965 (E.D. Mo. 2017)

(quoting *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996)).  As stated by the Eighth Circuit, it "is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased. . . . Indeed, one characteristic of mental illness is the presence of occasional symptom-free periods."  *Andler*, 100 F.3d at 1393.  Here, the longitudinal picture of Plaintiff's mental impairments shows he continues to exhibit several symptoms of psychotic illness, not "few," even through periods of regular treatment and improvement.  As the Eighth Circuit has explained, "'doing well' as a chronic schizophrenic is not inconsistent with a finding of disability."  *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001).  Thus, the ALJ ignored evidence of worsening and severe symptoms while focusing only on a limited period of improvement and failed to consider the waxing and waning nature of Plaintiff's mental illness.  *Andler*, 100 F.3d at 1393 (reversing in part for same error); *Lillard*, 376 F. Supp. 3d at 988 (same); *Santiago v. Saul*, No. 4:19-cv-01-CDP, 2020 WL 1083573, at *6 (E.D. Mo. Mar. 6, 2020) (remanding in part because ALJ's selective review of record for positive notations of improvement not support a determination that symptoms were controlled).

Second, the record does not demonstrate that Plaintiff was consistently non-compliant with his medications or treatment.  Notably, Plaintiff's "incidents of noncompliance appear to be *related* to his mental impairments."  *Frederick*, 247 F. Supp. 3d at 1029 (emphasis added).  The record shows instances of non-compliance were on days when Plaintiff presented to the emergency room due to *increased symptoms* of schizophrenia and bipolar disorder or when he reported that his medications were not working.  *Id.* (remanding in part for this same reason).

Third, and most importantly, the ALJ failed to properly consider that Plaintiff's non-compliance may be a product of his mental impairments.  "The Eighth Circuit has repeatedly recognized that a mentally ill claimant's non-compliance with treatment can be, and ordinarily is,

the result of the mental impairment itself and cannot, with nothing more, be deemed willful or unjustifiable . . . ."[7]  *Frederick*, 247 F. Supp. 3d at 1029 (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 945–47 (8th Cir. 2009)).  Here, there is no denying substantial evidence shows Plaintiff's substance use and mental impairments are connected.[8]  Numerous records from 2016 to 2019[9] document Plaintiff's consistent complaints of hallucinations and subsequent use of alcohol and marijuana to *help make the voices go away*.  Plaintiff also reported using these substances to help with other symptoms from his mental impairments such as sleep, mood, anxiety, and more.  Also, Plaintiff often turned to substances to cope, and Providers specifically noted Plaintiff's mental impairments caused him issues coping and handling stress.  Moreover, Providers noted Plaintiff's "poor insight and judgment" specifically in relation to his alcohol and marijuana use.  *See Pate-Fires*, 564 F.3d at 946 (remanding in part because poor insight and judgment were noted to be linked with non-compliance).  Thus, while there may be substantial evidence to support the ALJ's finding that Plaintiff "knew"[10] he needed to stop using alcohol and marijuana, "this evidence does not resolve the relevant question here: whether [his] failure or even refusal to follow the prescribed treatment was a manifestation of [his] schizoaffective or bipolar disorder."  *Pate–Fires*, 564 F.3d at 946.  The ALJ erred when it failed to consider or answer this question.  This error is even more pronounced in a situation as here, where substantial evidence shows Plaintiff's "psychological

---

[7] This principal similarly applies to the ALJ's credibility analysis.  *Frederick*, 247 F. Supp. 3d at 1029. In other words, if such incidents of non-compliance appear to be related to Plaintiff's mental impairments, then it is an insufficient basis to undermine the credibility of his complaints.

[8] While this may be true, that does not  necessarily mean Plaintiff's disorders "justify" the continued non-compliance or cause the symptoms/limitations themselves.  Rather, there must be medical evidence demonstrating Plaintiff's "non-compliance was [or was not] attributable to h[is] mental illness."  *Pate-Fires*, 564 F.3d at 946.

[9] Records dating back as far as 2009 also document Plaintiff's consistent use of substances to self-medicate.

[10] The "ALJ failed to make the critical distinction between [Plaintiff's] awareness of the need to [comply] and the question [of] whether h[is] noncompliance [] was a medically-determinable symptom of h[is] mental illness."  *Pate–Fires*, 564 F.3d at 945.

difficulties" may have deprived him of "the rationality to decide whether to continue treatment or medication." *Id.* at 945.

Nonetheless, the ALJ concluded that if Plaintiff was "truly desirous of work," he, like a "*reasonable* individual" would not "repeatedly fail to comply" with prescribed treatments intended to alleviate his "allegedly" severe symptoms. (Tr. 26, 28) (emphasis added). But, as explained above, the ALJ failed to discern whether Plaintiff's "noncompliance with [treatment] was a medically-determinable symptom of [his] mental illness." *Pate–Fires*, 564 F.3d at 945. Instead, the ALJ's determination that Plaintiff's "medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Id.* at 946–47; *see also Adamczyk v. Saul*, 817 F. App'x 287, 289 (8th Cir. 2020) (explaining the ALJ errs when it "plays doctor" meaning "the ALJ cannot draw improper inferences from the record or substitute a doctor's opinion for his own"). This error is further illuminated by the complete absence of *any* medical evidence, *i.e.*, a discussion by a doctor or other professional, that indicates Plaintiff's "noncompliance at any time was a result of something other than [his] mental illness." *Pate–Fires*, 564 F.3d at 946. Thus, the ALJ erred by substituting its own opinion for a medical one. *Adamczyk*, 817 F. App'x at 289.

This error also led the ALJ to make improper inferences from the record. *Id.* In denying disability, the ALJ stated, "Plaintiff's decision to use alcohol and other substances instead of following treatment shown to alleviate his symptoms appears to be the primary impediment to his ability to sustain full-time work on a long-term basis." (Tr. 28). But, the ALJ improperly based the decision on what the impact of substance abuse had on Plaintiff's ability to function rather than Plaintiff's functional limitations *due* to his severe mental impairments and subsequent substance

13

use. Thus, the ALJ's conclusion that Plaintiff's functional limitations were not caused by his mental impairments is not supported by the record.

Essentially, the ALJ concluded Plaintiff's medical noncompliance was not justifiable and precluded a finding of disability, but such a conclusion is both not supported by substantial evidence and in violation of the law. *Pate–Fires*, 564 F.3d at 946–47 (remanding for similar reason); *Adamczyk*, 817 F. App'x at 289 (explaining the ALJ errs when it "plays doctor"). On remand, the ALJ must determine whether Plaintiff's non-compliance with treatment and medication was a medically-determinable symptom of his severe mental impairments[11] with a medical opinion addressing the relationship between Plaintiff's substance abuse—*i.e.*: non-compliance—and his severe mental impairments. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (requiring the ALJ "to seek additional clarifying statements from a treating physician [if] a crucial issue is undeveloped"); *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (requiring ALJ to order medical examinations and tests "only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled"); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (ordering additional examinations and tests to assist in making an "informed decision" regarding the extent to which Plaintiff's impairments affect his ability to perform work-related activities).

---

[11] The Court notes this consideration is not to be confused with the ALJ's analysis of determining whether Plaintiff's substance use is a contributing factor material to his disability. *See* 42 U.S.C. 1382c(a)(3)(J); *see also Pettit v. Apfel,* 218 F.3d 901, 903 (8th Cir. 2000) ("Even if the [ALJ] determines that a claimant is disabled, the claimant may not obtain SSI benefits if either alcoholism or drug addiction is found to be a contributing factor material to that determination")). The Court also notes Plaintiff has the burden of proving that his substance abuse is not a contributing factor material to his alleged disability. *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002).

2. ***The ALJ Improperly Assessed Opinion Evidence***

a. **Dr. Skolnick's Opinion**

Plaintiff argues the ALJ erred by finding Dr. Skolnick's opinion persuasive. The Court agrees. Here, the only "medical opinion" evidence[12] rendered by a mental health professional is Dr. Skolnick—a one-time, non-examining consultative doctor. The ALJ found her February 2018 opinion "persuasive." Yet, it is well settled law that courts do not consider the opinions of non-examining, consulting physicians standing alone to be substantial evidence.[13] *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). This is particularly true where, as here, the state agency psychological consultant rendered her opinion well over a year earlier and, therefore, did not have access to numerous and significant medical records created thereafter. *McCoy*, 648 F.3d at 515 ("the opinion of a non-examining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records including relevant medical records made after the date of evaluation." (citing *Wildman v. Astrue*, 596 F.3d 959 968 (8th Cir. 2010)); *see also Doshie v. Saul*, No. 4:18-cv-876-PLC, 2019 WL 4059899, at *14 (E.D. Mo. Aug. 28, 2019). Although, in certain instances, the Court has found such a lapse in time does not impact the opinion's persuasiveness, *Orduna-Solorzano v. Kijakazi*, No. 4:20-cv-1464-MTS, 2022 WL 503731, at *9 (E.D. Mo. Feb. 18, 2022), such is not the case here. Treatment notes from March 2018 to July 2019, which Dr. Skolnick did *not* review, reflect a deterioration of Plaintiff's mental symptoms, including anxiety, depression, suicidal ideations, cutting, poor sleep, poor insight and judgment, and decreased appetite. Records show Plaintiff received frequent psychological treatment, and as late as April 2019, Providers still had

---

[12] Brumfield and Huhn's May 2019 opinion is not considered a "medical opinion." 20 C.F.R. §§ 416.902, 416.913.

[13] Also, the ALJ appears to have improperly relied on the opinion to reach the conclusion in Step 3. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) (allowing ALJ reliance on a "non-examining consulting physician" because the ALJ did not rely "solely" on the report and viewed the opinion as "one part of the record").

not discharged Plaintiff from treatment, requiring Plaintiff to see them frequently and continuing to adjust and prescribe psychiatric medication. *Hutsell*, 259 F.3d at 712 (remanding in part for this reason). Further, Plaintiff experienced significant psychiatric events, including psychiatric hospitalizations and other hospitalizations possibly related to his mental impairments. "The amount of time that elapsed and the number of medically significant intervening events that occurred after" Dr. Skolnick evaluated Plaintiff are reasons to discredit, rather than solely rely on, her opinion.[14] *Doshie*, 2019 WL 4059899, at *13. Therefore, the Court finds the ALJ assigned undue weight to Dr. Skolnick's opinion and thus failed to properly assess Plaintiff's impairments. *Id.* at *14 (remanding for same reason).

b. **Non-Medical Source Opinion by Brumfield and Huhn**[15]

Plaintiff also argues the ALJ improperly evaluated the May 2019 opinion of non-medical sources Joshua Brumfield, an Integrated Health Coach, and Julie Huhn, an Employment Specialist.[16] The ALJ dismissed this opinion stating that the opinion contains "little more than subjective complaints and no objective medical findings supporting a more restrictive RFC." (Tr. 25). However, the ALJ may not discount on this basis—Plaintiff's complaints and self-reported medical history is an "essential diagnostic tool," and nothing in the record suggested Plaintiff's medical professionals should have doubted his credibility. *See Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997). Rather, the record shows providers frequently noted Plaintiff's accuracy and honesty in reporting. Further, there is no indication that the opinion solely relied on Plaintiff's subjective reports. Rather, Plaintiff has been treated by medical sources, such as psychiatrists, at

---

[14] This also undermines the ALJ's conclusion that the opinion was consistent with the record as a whole. (Tr. 26).

[15] Plaintiff does not dispute that the opinion is from non-medical sources.

[16] Plaintiff also argues the ALJ failed to evaluate the opinion in accordance with the factors in 20 C.F.R. 404.1527(f)(1) ("Evaluating opinion evidence for claims filed *before* March 27, 2017"). However, Plaintiff filed for SSI in September 2107—*after* March 27, 2017—thus, according to the applicable regulations, the ALJ is "not required to articulate" how it considered evidence from non-medical sources. *See* 20 C.F.R. § 416.920c(d).

Places for People throughout the entire period of alleged disability.  There, a team of providers—
including doctors, therapists, health coaches, and employment advisories—all work together and
share information.  The ALJ's discreditation should have considered this factor.[17]

### 3. *The ALJ Improperly Assessed Plaintiff's Mental Impairments*

Finally, the Court finds the ALJ's rating of functional limitations at Step 3 and subsequent
RFC assessment and Step 5's job finding is not supported by substantial evidence.

#### a.  <u>**Rating the Severity of Plaintiff's Functional Limitations at Step 3**</u>

At Step 3, the ALJ determined Plaintiff's severe mental impairments were not disabling
based on a finding that Plaintiff had only "mild" or "moderate" limitations in the four areas of
mental functioning.[18]  In making this determination, the ALJ relied on Dr. Skolnick's opinion and
the ALJ's own inferences from the record.  However, as discussed directly above, the ALJ placed
undue weight on Dr. Skolnick's opinion, and this error alone could warrant remand.  *See e.g.*,
*Doshie*, 2019 WL 4059899 at *14.  But, even disregarding Dr. Skolnick's opinion, the Court finds
the record lacks substantial evidence to support the Step 3 assessment.  While the Court has found
ALJ inferences in the absence of a medical opinion does not always plague a functional limitation
assessment, it does here.  *See Nisic v. Kijakazi*, No. 4:20-cv-1202-MTS, 2022 WL 605230, at *7–
9 (E.D. Mo. Mar. 1, 2022) (finding substantial evidence supports ALJ's rating of "mild" limitations
with no medical opinion).  Namely, because here, the ALJ drew several "improper inferences from
the record," *Adamczyk*, 817 F. App'x at 289, some of which the Court already discussed.  Other
improper inferences include finding Plaintiff's minimal daily activities inconsistent with chronic

---

[17] However, this does not *negate* Plaintiff's duty to provide the ALJ with competent medical evidence—from a *medical source*—proving the severity/functional limitations of his mental impairments and RFC limitations.

[18] In accordance with the regulations, the ALJ rated the degree of Plaintiff's functional limitations by looking at four broad functional areas: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. §§ 416.920a(c)(3)–(4).

mental disability.  *See Pate-Fires*, 564 F.3d at 947 (quoting *Hutsell,* 259 F.3d at 713 (finding cooking, cleaning, watching TV, and shopping for groceries are minimal daily activities consistent with chronic mental disability)).   While the "ALJ is in the best position to determine the credibility" of Plaintiff, *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001), the Court notes that the Eighth Circuit has made clear, Plaintiff's "ability to do light housework and occasional visiting with friends does not support a finding" that he can do full-time work in the "competitive and stressful conditions in which real people work in the real world." *Reed*, 399 F.3d at 923–24. Also, the ALJ improperly found Plaintiff's random intermittent side jobs inconsistent with his alleged limitations.  *See Andler*, 100 F.3d at 1393 (reversing ALJ decision and awarding claimant benefits because ALJ improperly focused on sporadic work history instead of considering the overwhelming evidence claimant was incapable of performing work for sustained periods). Although Plaintiff "presents a strong desire for personal advancement and gainful employment,"— *e.g.*: to make child support payments[19]—his "work history demonstrates his inability to hold a job." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984) (reversing and granting disability in part on this basis).  As such, the ALJ's rating of functional limitations at Step 3 is not supported by substantial evidence in this record.

b.  **Assessing Plaintiff's RFC**

The ALJ found Plaintiff had the RFC to perform "medium work" with some limitations and thus, could perform jobs in the national economy.  Because the Court finds the ALJ erred at Step 3, the RFC and Step 5's finding is inherently inadequate.  20 C.F.R. § 416.920a(d)(3) (determining RFC *after* Step 3); *id.* at § 416.960(c) (determining Step 5 based on RFC).  Thus, the

---

[19] Plaintiff frequently explained that working was important to him so he could provide child support.  The record shows Plaintiff attempted to but struggled maintaining a job; he would do side jobs—*i.e.*: yard work—to have some sort of an income.  Records from 2018 and 2019 show Plaintiff actively trying to find work and struggling to maintain work.  (Tr. 1539, 1535, 1760, 2068).

ALJ's finding that Plaintiff has the RFC for medium work or that there are a significant number of jobs is not supported by substantial evidence on this record as a whole.  The Court does not wish to belabor this point any longer but finds it necessary to make one additional point so that the ALJ can properly assess this case on remand.

The RFC assessment is an indication of what the claimant can do on a "*regular and continuing basis*" given his mental impairments.  20 C.F.R. § 404.1545(c) (emphasis added).  It follows then, that the RFC requires more than a simple determination that the claimant can find employment that accommodates his limitations; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time.  *Parsons*, 739 F.2d at 1340.  Indeed, it is "necessary from time to time to remind the" ALJ that the RFC must be based on a claimant's "ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

This reminder is especially important here because Plaintiff established that his mental impairments impair or prevent him from holding jobs with the limitations recognized by the ALJ. *Goff*, 421 F.3d at 790 ("A disability claimant has the burden to establish her RFC."); *Nguyen*, 75 F.3d at 430 (explaining a claimant has the burden of proving the severity of his impairment).  Plaintiff's symptoms worsen with stress, he lacks sufficient coping abilities, he experiences social anxiety, and he abuses substances.  Plaintiff's difficulty coping with social stressors are well-documented in the medical record.  There is also significant evidence that Plaintiff's "difficulty in maintaining employment and attending school was caused by his psychiatric symptoms."  *Frederick*, 247 F. Supp. at 1029.  Most notable, Plaintiff explains the biggest impediment to sustaining continuous work is because of the "voices" in his head.  As discussed, even when compliant with medication, Plaintiff experiences these auditory hallucinations—and the record shows Plaintiff has

19

experienced this symptom for well over twenty years.   Thus, substantial evidence on this record does not support the ALJ's determination that Plaintiff had the RFC to work on a regular and continuing basis without being overwhelmed by his mental impairments.

Further, on remand, the ALJ must determine whether Plaintiff can actually work on a *full time basis*, not just that he *can* work.   The ALJ must be cognizant when assessing Plaintiff's ability to perform jobs in the national economy and "*must* take into account the *actual* ability of the claimant to find and *hold* a job in the real world." *Parsons*, 739 F.2d at 1340 (emphasis added). Plaintiff has a tortured history of mental disorders as well as alcohol and drug problems, he has been hospitalized on numerous occasions for psychotic episodes, and he often experiences erratic psychotic breakdowns.   While his medication might help him control his impairments, it does not completely alleviate his symptoms or preclude the possibility his impairments will later deteriorate. *Pate-Fires*, 564 F.3d at 947.   And, as the Court already noted, even when Plaintiff's impairments are "controlled," several symptoms remain that may preclude his ability to sustain work on a continuous basis.   Because employers are concerned with substantial capacity, psychological stability, and steady attendance, *Parsons*, 739 F.2d at 1340, the ALJ must, therefore, take into account evidence indicating Plaintiff's *true* functional ability.

* * * * * *

The Court acknowledges that it is not its role to re-weigh the evidence—rather that is the role of the ALJ. *Cox*, 495 F.3d at 617.   However, the Court does not find that the "quantity and quality of evidence is such that a reasonable mind might find it adequate to support the ALJ's conclusion." *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).   The ALJ erroneously attributed Plaintiff's limitations from his severe mental impairments to non-compliance and other issues unrelated to his ability to work.

Thus, it failed to properly assess Plaintiff's functional limitations from his mental impairments. This error also resulted in the record and accompanying decision being devoid of proper evidence demonstrating whether Plaintiff could maintain full-time work. *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012) ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on his ability to work."). With that said, the Court finds that the current record cannot support a disability determination either in favor of or against Plaintiff. *Nelson v. Saul*, 413 F. Supp. 3d 886, 921 (E.D. Mo. 2019) (remanding on this basis). Thus, on remand the ALJ must reevaluate Plaintiff's disability, specifically at Step 3, the RFC, and Step 5. On remand, the ALJ should reevaluate Plaintiff in accordance with this Memorandum and Order as well as the following:

1. The ALJ shall determine whether Plaintiff's non-compliance with treatment and medication was justifiable based on his "psychological difficulties." *Pate–Fires*, 564 F.3d at 945–46. This must be accomplished by either ordering a consultative examination of Plaintiff or contacting Plaintiff's treating psychiatrist or physician. *Stormo*, 377 F.3d at 806; *McCoy*, 648 F.3d at 612. The ALJ must also determine or order any additional tests or examinations to determine the nature and extent of plaintiff's non-compliance, including, but not limited to, the severity and persistency of Plaintiff's functional limitations *with* and *without* substance abuse.

2. The ALJ shall reassess Plaintiff's credibility, keeping in mind that, given his severe mental impairments spanning several decades, Plaintiff's daily activities, side jobs, and non-compliance with treatment and medications may not be appropriate reasons to discredit him.

3. The ALJ shall obtain and provide Plaintiff an opportunity to submit additional medical evidence that addresses his ability to function in the workplace, which may include contacting Plaintiff's treating psychiatrist or physician to clarify his limitations and restrictions in order to ascertain what level of work, if any, he is able to perform. *Santiago*, 2020 WL 1083573, at *8 (citing *Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007) and *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006)).

4. The ALJ shall order a new consultative examination to determine Plaintiff's RFC during the relevant period. *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000) (holding that it is reversible error for an ALJ to fail to order a consultative examination if one is necessary to make an informed decision). As discussed, Plaintiff's new diagnoses, increased symptoms, and regular psychological treatment presented an "ambiguity" in the record concerning the

continued applicability of the RFC assessment rendered by Dr. Skolnick.  *Jones v. Saul*, No. 4:20-cv-797 SRW, 2021 WL 4281292, at *11 (E.D. Mo. Sept. 21, 2021) (citing 20 C.F.R. § 416.919a(b)(4) (providing a consultative examination may be required when "[t]here is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established")); *see Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001) (finding ALJ not required to order another examination because "substantial evidence" allowed ALJ to make an "informed decision").

5.  The ALJ shall obtain and consider a new opinion from a vocational expert to determine Plaintiff's true functional and working abilities.  *Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001) ("Because the hypothetical question posed to the vocational expert was based on this incorrect RFC, the expert's response cannot constitute substantial evidence to support a conclusion that Holmstrom is not disabled.").  The hypothetical and later determination must evaluate Plaintiff's ability to work on a regular and continual basis.

6.  The ALJ should consult any additional experts needed to properly assess Plaintiff's limitations in order to formulate his functional limitations, RFC, and to determine whether Plaintiff is capable of performing a significant number of jobs.

7.  The ALJ shall afford Plaintiff a reasonable opportunity to supplement the medical evidence to address the issues identified herein.  Plaintiff should remain cognizant that the ultimate burden of proving disability rests with him.

**C**ONCLUSION

After carefully reviewing the record as a whole, the Court finds the administrative record is not sufficiently developed as to Plaintiff's mental impairments to make a determination as to his disability.  *See Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994) (determination of when the Commissioner has failed to develop the record is made on a case-by-case basis).  In re-assessing the limiting functions of Plaintiff's mental impairments and the mental RFC on remand, the ALJ shall do it in accordance with this Memorandum and Order.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Acting Commissioner is

**REVERSED** and **REMANDED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 7th day of March 2022.

_____

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE